## M. JOSEPH DeMATTEO *vs.* SUSAN J. DeMATTEO.

Plymouth. October 2, 2001. - February 8, 2002.

Present (Sitting at Salem): MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Divorce and Separation,* Separation agreement, Attorney's fees. *Contract,* Antenuptial agreement. *Husband and Wife,* Antenuptial agreement.

Evidence in a divorce proceeding did not warrant a Probate and Family Court judge's conclusion that an antenuptial agreement was not valid at the time of its execution, where the wife was fully informed of the financial worth of her prospective husband before she executed the agreement [27-28]; where the wife recognized that marriage conferred certain rights, and that she waived those rights by signing the agreement [28-30]; and where the judge's findings did not support a conclusion that the agreement was not fair and reasonable when it was executed, even though a judge might have awarded the wife a significantly larger share of the marital estate under G. L. c. 208, § 34 [30-34].

Evidence in a divorce proceeding did not warrant a Probate and Family Court judge's conclusion that an antenuptial agreement was not enforceable at the time of the divorce trial, where, applying a "conscionability" standard to the agreement, there were no circumstances that had occurred during the marriage that would have left the wife without sufficient property, maintenance, or appropriate employment to support herself if the agreement was enforced. [34-38]

In a divorce proceeding, the judge was well within her discretion in ordering the husband to pay the wife's attorney's fees during the pendency of litigation to enable her to defend the action and to contest the validity and enforceability of an antenuptial agreement, and this court remanded the case for a determination of the fees for the wife's attorney not incommensurate with an objective evaluation of the services performed. [38-39]

COMPLAINT for divorce filed in the Plymouth Division of the Probate and Family Court Department on March 13, 1998.

The case was heard by *Catherine P. Sabaitis,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Jacob M. Atwood (Mark T. Smith & David E. Cherny* with him) for the plaintiff.

*Peter F. Zupcofska* (*Fiona S. Trevelyan* with him) for the defendant.

MARSHALL, C.J. At issue in this appeal is the validity of a judgment in the Probate and Family Court that an antenuptial agreement is not enforceable. The judge concluded that the agreement was not fair and reasonable either at the time it was executed or when the husband sought its enforcement on commencing a divorce action nearly eight years after the parties were married. The husband appealed and we granted his application for direct appellate review. On appeal he challenges the judge's order as to the enforceability of the antenuptial agreement and her order that he pay the wife's attorney's fees.[1] We hold that the evidence did not warrant a conclusion that the antenuptial agreement is unenforceable, and reverse so much of the judgment to that effect. We affirm so much of the judgment as orders the husband to pay the wife's attorney's fees, but remand the case to the Probate and Family Court for a determination of the amount to be paid.

1. *Factual background.* The circumstances in which the parties' antenuptial agreement was negotiated and executed were as follows.[2] M. Joseph DeMatteo (husband) and Susan J. DeMatteo (wife) were married on March 23, 1990. At the time the husband was forty-seven years old, and the wife was forty-one years old. They had known each other as adolescents and had dated occasionally in the 1970's. In 1987, they renewed their earlier acquaintance. In 1989, the husband proposed marriage. He did so on condition that the wife sign an antenuptial agreement. She agreed to do so.

This was to be the husband's first marriage, and the wife's second. The wife had a daughter, born in 1983, from her first marriage. Until shortly before her second marriage in 1990, the wife lived with her daughter in a rented two-bedroom house in Dedham. She worked as a secretary earning approximately

---

[1]The judge denied the husband's motion to stay the divorce hearing and payment of attorney's fees pending the disposition of this appeal. The husband raises no claim in connection with that order.

[2]The relevant facts are drawn from the judge's written findings of fact. The husband does not dispute the findings; rather, he argues that the judge's subsidiary and ultimate findings do not support her rulings of law.

$25,000 a year, owned no real property, and had few assets. In contrast, the husband was a wealthy individual. He had a substantial ownership interest in his family's construction business; this and other real estate holdings and investments established him as a man of significant net worth, described more fully below. It is undisputed that the wife knew that her future husband was a man of considerable wealth, and that the husband knew that his future wife had few financial assets.

During the fall and winter of 1989-1990, the wife and the husband discussed the terms and necessity of an antenuptial agreement. The judge found that, although he was not "overbearing," the husband was "very clear that such an agreement was necessary." At the husband's urging, the wife retained independent legal counsel — Ann C. Palmer — to represent her in negotiating the agreement. Palmer was recommended to the wife by a friend. The husband was represented by his business counsel, Joel Lewin.

In February and March, 1990, Lewin and Palmer spoke several times and Lewin sent Palmer a draft antenuptial agreement. The draft provided, among other things, that if the marriage terminated by legal proceedings, including separation or divorce, the wife would receive the marital home free of encumbrance, the automobile that she was then driving, and an annual payment from the husband of $25,000 until her death or remarriage. On Palmer's advice, the wife did not accept these terms. Palmer sent a letter to Lewin rejecting the draft; she also requested full disclosure of the husband's assets. In response, Lewin delivered to Palmer the husband's tax returns for 1984 through 1988 and a current financial statement showing the husband's net worth to be between $83 million and $108 million. The husband's interests in his family's construction business comprised a majority of his assets. The wife made no further inquiries regarding the husband's assets and has not claimed that the husband's financial disclosures made before she signed the antenuptial agreement were incomplete, inaccurate, or misleading.[3]

On receipt of the husband's financial disclosures, Palmer

---

[3] The wife does complain that the husband divulged the financial information to her only two weeks before the agreement was executed.

consulted further with her client. She then informed Lewin that her client required that the husband increase the annual payments to the wife to $35,000, adjusted annually for increases in the cost of living. She also requested medical insurance, life insurance, and the lesser of twenty per cent of the husband's estate or $5 million. The husband rejected these requests. Further negotiations followed, the details of which are not necessary to describe, except to note that the wife dropped her demand for the lesser of twenty per cent of the husband's estate or $5 million in the event that the marriage was terminated by divorce.

The parties executed the agreement on March 21, 1990. The agreement, fifteen pages long, to which the parties' respective statements of assets were attached and incorporated,[4] contains provisions concerning the disposition of their separate assets on death[5] or if the marriage was "terminated or interrupted by divorce or other legal proceedings" during their lifetimes, disposition of liabilities, and numerous other provisions concerning such issues as breach, modifications, and choice of law. The agreement also contains provisions concerning waiver,[6] "fairness,"[7] warranties about legal advice,[8] and child support "if any

[4]The husband's revised statement of assets showed his net worth to be between $108 million and $133 million. The wife's financial statement showed assets of less than $5,000 in several bank accounts and ownership of a 1977 Chevrolet Nova automobile. At the time of trial in 2000 on the enforceability of the agreement, the husband's financial statement showed assets of $112 million and liabilities of $2 million.

[5]The parties negotiated and made provisions in the final agreement for property division and support should their marriage be terminated by the death of either one of them. Those negotiations and the terms of the final agreement on this point — substantially more favorable to the wife than the provisions concerning termination of the marriage by divorce — are not relevant to this action.

[6]The parties acknowledged that they were informed of their rights, had considered the effect of the agreement on their estates, and freely and willingly waived rights that "may well have great value" in exchange for the provisions of the agreement.

[7]A section entitled "Fairness Considerations" provided that the husband and the wife "acknowledge that they have considered the fairness of this Agreement in light of the present size and character of his and her estate as disclosed in [the Agreement and that] . . . [a]fter consideration of their respective disclosures as to their respective financial circumstances . . . each party deems it to be in his or her best interest to execute this Agreement."

[8]The husband and the wife acknowledged that they had legal advice of their

children shall be born of their marriage."[9]

Concerning termination of the marriage on divorce, the agreement provided that the wife would receive the marital home free of encumbrance,[10] yearly support of $35,000 until her death or remarriage with an annual cost-of-living increase,[11] an automobile, and medical insurance until her death or remarriage. All property jointly acquired during the marriage would be divided between the parties in equal shares.

Both attorneys were present when the parties executed the agreement and the signing was recorded on videotape. The recording shows the husband's attorney reciting the terms of the agreement and the parties communicating their understanding of and consent to those terms. The parties acknowledge they have received advice from counsel of their choice, that they understand their rights in the absence of the agreement, and that they each have read the other's financial disclosures.

2. *Procedural background.* On March 13, 1998, the husband filed a complaint for divorce under G. L. c. 208, § 1B, alleging that the marriage was irretrievably broken down and seeking enforcement of the antenuptial agreement. The wife denied that the marriage was irretrievably broken down and challenged the enforceability of the agreement. The judge allowed the

---

own choosing, and that with the advice of counsel each had considered carefully the financial disclosures appended to the agreement.

[9] The wife and the husband had two children during their marriage. The agreement provided for a judicial resolution of all matters concerning any children of the marriage, including child support, custody, and visitation. The agreement made no provision for the wife's only child of her first marriage. At the time of entry of judgment, the husband continued to support the wife's daughter, as he had done since the parties began living together.

[10] At the time of the execution of the agreement, the parties lived with the wife's child in the husband's Hyannis condominium. The agreement provides that the wife would receive the Hyannis property, or a residential property "of substantially equal value" if the Hyannis property were sold.

The judge found that, after they were married, the parties continued to live in Hyannis, but that, in 1992, they purchased the "marital" home in Norwell, and spent their summers at the Hyannis property. After the parties separated the husband purchased a second home in Norwell where he now resides.

[11] The cost of living increase covered the period between the date of the parties' marriage and the time of the initiation of any divorce action only. There would be no further cost of living increases from the commencement of a divorce action to the time of the wife's death or remarriage.

husband's motion to bifurcate the trial to consider first the validity and enforceability of the agreement. There followed three days of testimony solely on that issue. On February 12, 2001, the judge issued comprehensive findings of fact, conclusions of law, and a judgment that the antenuptial agreement was "not fair and reasonable at the time of its execution and is not fair and reasonable at the present time, and therefore may not be enforced." Because it elucidates our discussion of the issues, we describe in some detail the judge's rulings of law and her supporting analysis; her findings are summarized above.

The judge considered whether the agreement was fair and reasonable. See *Osborne* v. *Osborne*, 384 Mass. 591, 599 (1981). Without differentiating between fairness at the time of execution and fairness at the time of the trial, the judge concluded that the agreement was neither fair nor reasonable at either point in time. She based her determination on "the entirety of the financial settlement" to the wife, on what she termed "the lack of substantial negotiations involved before the agreement was executed," the "sophistication of the issues involved," and "the lifestyle of the parties during the marriage and the vast disparity between the parties' ability to acquire future assets and income."

Addressing the claims of the wife, the judge placed no reliance on her assertion that she was incapacitated at the time she executed the agreement. She found that the wife did not suffer from any incapacity due to any health reasons at the time, nor did she lack "education or business acumen to appreciate the significance of what she was doing," as the wife had also claimed. The judge did not credit the wife's contention that she signed the agreement under duress: "If she was under as much duress as she claimed to be, it was not at all apparent" on the video taped recording."[12]

Concerning the negotiations preceding the agreement's execution, the judge found that there was "complete financial

---

[12]The wife testified that she did not want to sign the agreement and felt ill and nauseous on the day of execution. The judge found that the wife did not so inform the husband and showed no reluctance in signing it. The judge also found that the videotape recording showed no indication that the wife appeared "distressed, distracted, resistant, uncooperative, or otherwise unwilling" to sign the agreement.

disclosure by both parties." She nevertheless pointed to what she characterized as "minimal" negotiations prior to the agreement's execution, noting that "the financial and legal issues involved in this case were quite complex." The judge concluded that the wife "did not fully explore all the options available to her, nor was there any real discussion with her about either the consequences of this agreement or the possible results after a [G. L. c. 208,] § 34 hearing." She gave no weight to the fact that the wife was represented by independent counsel, noting only that the wife did not "discuss with her counsel what she might anticipate in terms of an appropriate financial settlement in the even[t] of a divorce." The judge found that the wife was "aware of the criteria considered by the Court under [§ ] 34," but that "there was [no] real explanation of its application to her case."[13]

Turning to other factors, the judge also noted that "in view of the fact that this is a ten year marriage which produced two children," the settlement for the wife was "less than modest." She pointed to the "financial holdings" of the husband, the parties' "lifestyle during the marriage," and the husband's "ability to acquire . . . significant assets" as compared to the wife, whose ability to acquire assets she termed "vastly inferior" to that of the husband.

In reaching her conclusion the judge explicitly relied on the "fair and reasonable" test as elaborated by the Appeals Court in *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85 (1984), a decision concerning the enforceability of a separation agreement. She reviewed the factors listed in that case[14] to conclude that the antenuptial agreement at issue here was unenforceable. The *Do-*

---

[13]In her findings of fact, the judge noted that the wife's counsel had been a member of the bar since 1979, and that sixty to seventy-five per cent of her practice was devoted to family law. The judge found that this was the attorney's "first case involving a premarital agreement, and her first case involving assets over one million dollars." The judge did not find that the attorney was not qualified to represent the wife or that she had failed to represent her adequately.

[14]*Dominick* v. *Dominick*, 18 Mass. App. Ct. 85 (1984), lists eight factors for assessing whether a separation agreement is fair and reasonable. These factors are "(1) the nature and substance of the objecting party's complaint; (2) the financial and property division provisions of the agreement as a whole; (3) the context in which the negotiations took place; (4) the complexity of the issues

*minick* case, she noted, permitted her to consider the mandatory and discretionary factors in G. L. c. 208, § 34, governing the assignment of assets by a judge in divorce proceedings.[15] Thus, the judge pointed to the length of the marriage, station, amount and source of income, employability, estate, and the needs of each party and the opportunity of each for future acquisition of assets and income.

The judge also noted that "[a] divorcing party's needs are to be measured by the standard of living enjoyed during the marriage, not by whether a proposed allocation would enable the party to merely survive or even to live comfortably," citing *Rosenblatt* v. *Kazlow-Rosenblatt*, 39 Mass. App. Ct. 297, 301 (1995). In that connection, the judge stated that, "[a]lthough they lived in a manner more frugally than their income required," the parties "lacked no comfort or convenience, and their lifestyle was by choice rather than necessity." She noted that the couple had spent money "on trips, jewelry, home and yard maintenance, outside help and other things that made life easier and actually, more luxurious," and that "[t]here were no limits placed on their personal spending." Finally, the judge concluded that an agreement will be "struck down" if there are countervailing equities to its enforcement or if it contains representations not supported in the record, even if the agree-

---

involved; (5) the background and knowledge of the parties; (6) the experience and ability of counsel; (7) the need for and availability of experts to assist the parties and counsel; and (8) the mandatory and, if the judge deems it appropriate, the discretionary factors set forth in G. L. c. 208, § 34" (footnotes omitted). *Id.* at 92. That the *Dominick* case involved a separation agreement, rather than an antenuptial agreement — as is at issue in this case — is discussed *infra*.

[15]General Laws c. 208, § 34, provides that: "In determining the amount of alimony, if any, to be paid, or in fixing the nature and value of the property, if any, to be so assigned, the court, after hearing the witnesses, if any, of each party, shall consider the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. In fixing the nature and value of the property to be so assigned, the court shall also consider the present and future needs of the dependent children of the marriage. The court may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit."

ment recites that it was entered into knowingly by the parties, who were advised of their rights by independent counsel, citing *Stansel* v. *Stansel*, 385 Mass. 510, 514-515 (1982), and *Randall* v. *Randall*, 17 Mass. App. Ct. 24, 31 (1983).

3. *Enforceability of the antenuptial agreement.* In *Osborne* v. *Osborne*, 384 Mass. 591, 598 (1981), we held that it is permissible for parties contemplating marriage to enter into an antenuptial contract settling their alimony or property rights in the event their marriage should prove unsuccessful. Noting that the freedom to limit or waive those rights in the event of divorce is not unrestricted, we set forth "some guidelines to be used in determining the extent to which such agreements should be enforced."[16] *Id.* at 599. First, a judge must determine whether an antenuptial agreement is valid. Second, "the agreement must be fair and reasonable at the time of entry of the judgment nisi." *Id.*

As to whether an agreement is valid, we adopted the "fair disclosure" rules announced in *Rosenberg* v. *Lipnick*, 377 Mass. 666 (1979), where we considered the validity of an antenuptial agreement settling property rights on the death of a party. Under those rules, a judge must determine whether the agreement:

> "(1) . . . contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the contesting party was fully informed of the other party's worth prior to the agreement's execution, or had, or should have had, independent knowledge of the other party's worth; and (3) a waiver by the contesting party is set forth" (footnote omitted).

*Id.* at 672.[17]

---

[16] An antenuptial agreement must also, of course, comport with the rules governing the formation of all contracts, for example, the necessity of consideration and the absence of fraud, misrepresentation, and duress. See *Rosenberg* v. *Lipnick*, 377 Mass. 666, 673 (1979).

[17] We also noted in *Rosenberg* v. *Lipnick*, *supra* at 673, that "antenuptial agreements must be so construed as to give full effect to the parties' intentions, but we are concerned that such agreements be executed fairly and understandingly and be free from fraud, imposition, deception, or overreaching."

## A

We first examine the judge's conclusion that the antenuptial agreement in this case was not valid at the time of execution. The application of the second and third *Rosenberg* rules to the evidence will be disposed of first.[18] It is clear that the wife was "fully informed" of the worth of her prospective husband before she executed the agreement. The judge found that there was "complete financial disclosure" by both parties, and it is undisputed that the wife was apprised that her prospective husband had a net worth between $108 million and $133 million; the husband gave the wife a detailed statement of his net worth, which he later supplemented. See note 4, *supra.* He also acceded to her request and provided her with copies of his income tax returns for the most recent five years.

Full and fair disclosure of each party's financial circumstances is a significant aspect of the parties' obligation to deal with each other "fairly and understandingly" because they stand in a confidential relationship with each other. *Rosenberg* v. *Lipnick, supra* at 673. While we have not elaborated on the point, it seems clear that it is sufficient that the disclosure be such that a decision by the opposing party may reasonably be made as to whether the agreement should go forward.[19] See, e.g., *In re Estate of Lopata,* 641 P.2d 952, 955 (Colo. 1982) (fair disclosure "is not synonymous with detailed disclosure," but "contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other"); *Button* v. *Button,* 131 Wis. 2d 84, 95 (1986) (requiring "fair and reasonable disclosure [of] financial status").

The wife claims that the negotiations were compressed in time and that she did not receive disclosure of the husband's

---

[18]The judge correctly noted that she was to test the enforceability of the agreement under the disclosure rules of *Rosenberg* v. *Lipnick, supra* at 672-673, although she did not examine each rule separately.

[19]A leading treatise has described the test this way: "The issue is whether an intelligent, competent person did have or should have had a general, adequate and sufficient knowledge of the other's worth to make an informed decision as to whether they wished to consent to the terms of the proposed premarital agreement." C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 20.8, at 654 (2d ed. 1996).

assets until two weeks before the parties executed the agreement. There is no evidence that time precluded the wife from exploring her options. The judge found the husband was not "overbearing"; he issued no ultimatum at the last moment.[20] The wife plainly had sufficient knowledge of her future husband's worth to make an informed decision as to whether she wished to consent to the agreement. What the judge characterized as "minimal negotiations" are circumstances insufficient to invalidate the agreement. The parties reached agreement after full disclosure of their respective financial positions and after negotiations during which they exchanged offers and counteroffers. The second *Rosenberg* rule is satisfied.

As to the third rule, that the agreement set forth a waiver by the contesting party of his or her rights, this agreement did just that, providing a waiver by the wife of all spousal rights, except those specifically provided in the agreement. See note 6, *supra*. The wife did challenge the agreement's validity, raising defenses of lack of capacity and duress, but the judge did not credit her evidence on those issues. See note 12, *supra*. The findings on this point are fully supported by the evidence.

Moreover, the parties were each represented by independent counsel. The judge found that the wife's attorney had informed her client that, by signing an antenuptial agreement, "she gave up her right to have the Court make an assignment of property

---

[20]Other courts have held that the lack of negotiations or insufficient notice, standing alone, is seldom enough to invalidate an antenuptial agreement. See, e.g., *Liebelt* v. *Liebelt*, 118 Idaho 845, 848 (Ct. App. 1990); *Howell* v. *Landry*, 96 N.C. App. 516, 528 (1989). Courts generally have treated such a claim as one of duress, and have found such a defense inapplicable where, as here, the party contesting the agreement had notice of the agreement. See, e.g., *Rose* v. *Rose*, 526 N.E.2d 231, 235-236 (Ind. Ct. App. 1988) (parties discussed necessity of agreement several times before wedding, and husband told wife he would not marry her if she did not sign agreement); *Matter of the Marriage of Adams*, 240 Kan. 315, 319-320 (1986) (husband approached wife morning of wedding and asked her to sign agreement; agreement was identical to one wife reviewed with her attorney); *Taylor* v. *Taylor*, 832 P.2d 429, 431 (Okla. Ct. App. 1991) (wife in possession of the agreement for three months prior to its execution); *Shepherd* v. *Shepherd*, 876 P.2d 429, 432 (Utah Ct. App. 1994) (parties discussed agreement for months prior to marriage and each had opportunity to review and make changes to it).

to her."[21] The judge found that the wife "initiated little discussion" with her attorney concerning the agreement, did not "assert herself regarding any changes" to the draft agreements, and "did not discuss" what she "might receive by way of property division from the Court in the event of a divorce." However, the wife selected her own counsel, and she cannot now attack the agreement on. the ground that her counsel was not sufficiently sophisticated in matters of antenuptial agreements.[22] Nor can the wife take advantage of her own failure to question her counsel more fully about the legal consequences of signing the antenuptial agreement and thereby avoid the agreement.[23]

Waiver is important because it underscores that each party is exercising a meaningful choice when he or she agrees to give up certain rights in anticipation of marriage. It was therefore correct for the judge to consider such factors as whether each party was represented by independent counsel, the adequacy of the time to review the agreement, the parties' understanding of the terms of the agreement and their effect, and a party's understanding of his or her rights in the absence of an agreement. See *Button* v. *Button, supra* at 95-96. See also *Rinvelt* v. *Rinvelt*, 190 Mich. App. 372, 376-379 (1991) (agreement must be "entered into voluntarily, with full disclosure, and with the rights of each party and the extent of the waiver of such rights understood"). But the evidence does not support a conclusion that the wife's waiver of her rights was not meaningful. However minimal her inquiries to her counsel, the failure to explore more fully with her lawyer the effect of signing the

---

[21]Counsel's letter states in part: "When you sign a pre-marital contract, you give up the opportunity of having the Court make an independent assignment of marital property, and accept the terms of the contract instead."

[22]To the extent there was any inadequacy of representation by the wife's attorney, that is a claim of the wife against her lawyer, not a basis for voiding the antenuptial agreement.

[23]The evidence is undisputed that the wife's attorney wrote to her before the execution of the agreement, enclosed a copy of G. L. c. 208, § 34, and instructed the wife to read it carefully, "so that you can evaluate properly the terms of the Pre-Marital Agreement that we are negotiating." Her attorney further told her that they would go over the statute when they met at the attorney's office the following Monday, March 19. The judge found that the wife's attorney had advised her client that the agreement in its final form was fair and reasonable.

agreement is chargeable to her (or her lawyer), not the husband.[24]
The wife recognized that marriage conferred certain rights, and
that she waived those rights by signing the agreement. The third
*Rosenberg* rule is satisfied.

We turn finally to the first *Rosenberg* rule, the requirement
that an antenuptial agreement contain a "fair and reasonable
provision" for the contesting party, measured at the time of
execution. The application of this legal standard to the parties'
agreement was vigorously contested at trial, as it is on appeal.

In *Rosenberg* v. *Lipnick, supra* at 672, we said that it is
permissible to consider "the parties' respective worth, the par-
ties' respective ages, the parties' respective intelligence, literacy,
and business acumen, and prior family ties or commitments."
We noted, however, that "the reasonableness of any monetary
provision in an antenuptial contract cannot ultimately be judged
in isolation." *Id.* On the one hand, any examination of the
validity of an antenuptial agreement must respect the parties'
freedom to contract. The Legislature has recognized that ante-
nuptial agreements settling property rights on marriage serve
the useful function of permitting the parties to arrange their
financial affairs as they best see fit. See G. L. c. 209, § 25.[25] We
recognize those same interests. See *Osborne* v. *Osborne*, 384
Mass. 591, 598 (1981) ("There is no reason not to allow persons
about to enter into a marriage the freedom to settle their rights
in the event their marriage should prove unsuccessful, and thus
remove a potential obstacle to their divorce"); *Rosenberg* v.
*Lipnick, supra* at 673 ("The right to make antenuptial agree-

---

[24]The wife did not claim or prove that her counsel was incompetent. Cf.
*Cladis* v. *Cladis*, 512 So. 2d 271, 274 (Fla. Dist. Ct. App. 1987) (trial judge's
finding that wife did not have competent assistance of counsel no basis for
setting aside valid property settlement agreement).

[25]General Laws c. 209, § 25, provides that: "At any time before marriage,
the parties may make a written contract providing that, after the marriage is
solemnized, the whole or any designated part of the real or personal property
or any right of action, of which either party may be seized or possessed at the
time of the marriage, shall remain or become the property of the husband or
wife, according to the terms of the contract. Such contract may limit to the
husband or wife an estate in fee or for life in the whole or any part of the
property, and may designate any other lawful limitations. All such limitations
shall take effect at the time of the marriage in like manner as if they had been
contained in a deed conveying the property limited."

ments settling property rights in advance of marriage is a valuable personal right which courts should not regulate destructively"). On the other hand, the State has an interest in protecting the financial interests of spouses when they divorce. Marriage is not a mere contract between two parties, but a legal status from which certain rights and obligations arise. See *French* v. *McAnarney*, 290 Mass. 544, 546 (1935). See also *Button* v. *Button*, *supra* at 94. It was for this reason that we determined that the freedom to limit or waive legal rights in the event of divorce "is not appropriately left unrestricted." *Osborne* v. *Osborne*, *supra* at 599.

To meet the requirement of "fair and reasonable," at the time of execution an antenuptial agreement need not approximate an alimony award and property division ruling a judge would be required to make under G. L. c. 208, § 34. Judged by those statutory requirements, the parties' right to settle their assets as they wish would be meaningless. The relinquishment of claims to the existing assets of a future spouse, even if those assets are substantial, also does not necessarily render an antenuptial agreement invalid. An antenuptial agreement may be most desired when a wealthy individual contemplating marriage seeks to ensure that, if the marriage is not successful, his or her own assets will not accrue to the spouse. Many valid agreements may be one sided, and a contesting party may have considerably fewer assets and enjoy a far different lifestyle after divorce than he or she may enjoy during the marriage. It is only where the contesting party is essentially stripped of substantially all marital interests that a judge may determine that an antenuptial agreement is not "fair and reasonable" and therefore not valid. Cf. *French* v. *McAnarney*, *supra* at 546-548.[26] Where there is no evidence that either party engaged in fraud, failed to disclose assets fully and fairly, or in some other way took unfair advantage of the confidential and emotional relationship of the other when the agreement was executed, an agreement will be valid unless its terms essentially vitiate the very status of marriage. Our test of "fair and reasonable" is not the same as the test of "unconscionability" that has been adopted in other jurisdictions. *Upham* v. *Upham*, 36 Mass. App. Ct. 295, 301

---

[26]See also C.P. Kindregan, Jr., & M.L. Inker, *supra* at § 20.8, at 652.

(1994). We agree with the reasoning of the Appeals Court in *Upham* that while there may be substantial overlap between the standards, a standard of unconscionability generally "requires a greater showing of inappropriateness." *Id.*, citing 3 Lindey, Separation Agreements and Antenuptial Contracts § 90.07 (1993). See *Brash* v. *Brash*, 407 Mass. 101, 106 (1990) (separation agreement deemed "not . . . fair and reasonable and, in fact, . . . unconscionable"). A number of States have adopted a test of unconscionability. See, e.g., *Scherer* v. *Scherer*, 249 Ga. 635, 641 (1982); *Gentry* v. *Gentry*, 798 S.W.2d 928, 936 (Ky. 1990); *Ferry* v. *Ferry*, 586 S.W.2d 782, 786 (Mo. Ct. App. 1979); *MacFarlane* v. *Rich*, 132 N.H. 608, 614, 616-617 (1989).[27] The standard of unconscionability measured at the time of an antenuptial agreement's making was also adopted in the Uniform Premarital Agreement Act.[28] 9C U.L.A. 35 (Master ed. 2001). On the other hand, our "fair and reasonable" test is consonant with the standard recognized in a number of other States. See, e.g., *Ex parte Walters*, 580 So. 2d 1352, 1354 (Ala. 1991); *Harbom* v. *Harbom*, 134 Md. App. 430, 443 (2000), quoting *Hartz* v. *Hartz*, 248 Md. 47, 63 (1967) (antenuptial agreement upheld if agreement was "fair and equitable under the circumstances"); *McKee-Johnson* v. *Johnson*, 444 N.W.2d 259, 267-268 (Minn. 1989) (agreement must be substantively fair at the time of execution and at the time of enforcement); *Matter of the Estate of Crawford*, 107 Wash. 2d 493, 496 (1986) ("if the agreement makes a fair and reasonable provision for the party not seeking its enforcement, the agreement may be upheld").

We see no reason to replace our standard of "fair and reason-

---

[27]See also 2 A. Lindey & L.I. Parley, Separation Agreements and Antenuptial Contracts § 110.66[2], at 110-59 (2d ed. 1999).

[28]See Uniform Premarital Agreement Act § 6 (a)(2). 9C U.L.A. 48-49 (Master ed. 2001). The Act, first approved in 1983, has been substantially adopted in at least twenty-eight States and the District of Columbia: Arizona, Arkansas, California, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Texas, Utah, Virginia, West Virginia, and Wisconsin. Legislation to adopt the Act has been introduced in the South Carolina General Assembly, but has not passed. See *Hardee* v. *Hardee*, 348 S.C. 84, 94 n.6 (Ct. App. 2001).

able" when we test the validity of the agreement at the time of execution with a standard of "unconscionability." As noted by the commissioners, the unconscionability standard was adopted in the Uniform Act in part because it "is used in commercial law, where its meaning includes protection against one-sidedness, oppression, or unfair surprises . . . and in contract law." 9C U.L.A. 49-50 at comment, quoting Commissioner's Note, Uniform Marriage and Divorce Act § 306, 9A (Part I) U.L.A. 249 (Master ed. 1988). Antenuptial agreements by their nature concern confidential relationships, and a standard for testing the validity of a business agreement seems to us inappropriate in this context.

We turn to examine the judge's analysis in this case of the fairness and reasonableness of the agreement at the time it was executed. In making her determination, the judge considered the factors enumerated in *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 92 (1984),[29] as well as some of the factors listed in G. L. c. 208, § 34. The judge also emphasized the parties' lifestyle and standard of living during their marriage, relying on *Rosenblatt* v. *Kazlow-Rosenblatt*, 39 Mass. App. Ct. 297, 301 (1995). We agree with the husband that the judge applied the incorrect legal standard. The considerations that permit a judge to conclude that a separation agreement is "fair and reasonable" are different from those that permit a judge to conclude that an antenuptial agreement is "fair and reasonable." Parties to a separation agreement are joined in marriage. On termination of their marriage, it is entirely appropriate that the statutory factors that govern the award of property and support should inform, in part, the fairness and reasonableness of a separation agreement. The separation agreement is, after all, a substitute for the independent application by a judge of those same statutory factors. An antenuptial agreement, in contrast, permits the parties to define the material aspects of their relationship before they enter into the status of marriage. If the terms of a proposed antenuptial agreement are unsatisfactory, a party is free not to marry. See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 20.10, at 661 (2d ed. 1996) ("If antenuptial agreements are to have any standing under which the parties can rely

---

[29]See note 14, *supra.*

on them as an effective settlement of their financial interests, then it is clear that a trial judge cannot simply base the judgment nisi on the same factors set out in [G. L. c. 208, § 34]'').

Applying the correct legal standard, we conclude that the judge's findings do not support a conclusion that the agreement was not fair and reasonable when it was executed. Substantively, the agreement provided that in the event of divorce the husband would continue to provide for the wife's support and her health insurance until her death or remarriage; she would also have housing (the marital home) and transportation. These provisions do not strip the wife of her marital rights. In fact, they leave her in a better economic position than she had before the marriage. The first *Rosenberg* rule is therefore satisfied. That a judge might have awarded her a significantly larger share of the marital estate under G. L. c. 208, § 34, does not render the agreement unfair and unreasonable at the time of its execution. We recognize that the standard of living the wife will be able to enjoy after any divorce will be significantly lower than the one she enjoyed during her marriage. However, she was free to refuse to sign the antenuptial agreement; she was free to refuse marriage on those terms.

For all of these reasons, we conclude that the antenuptial agreement was valid when it was executed by the parties before their marriage in 1990.

## B

By concluding that the antenuptial agreement "was not fair and reasonable at the time of execution," the judge held, in essence, that the agreement was not valid. See *Osborne* v. *Osborne*, 384 Mass. 591, 599 (1981) (validity of antenuptial agreements "should be judged by the same 'fair disclosure' rules" as in *Rosenberg* v. *Lipnick, supra*). She nevertheless proceeded to consider whether the agreement was "fair and reasonable" at the time of the divorce trial, although a "second look" at the agreement is required only when a judge concludes that an antenuptial agreement is valid. *Id.* Because we have concluded that the agreement is indeed valid, we are required to consider whether there is any reason not to enforce it.

In *Osborne*, we suggested that this "second look" at an an-

tenuptial agreement gave the judge the authority to deviate from the terms of an antenuptial agreement "in certain situations, for example, where it is determined that one spouse is or will become a public charge, or where a provision affecting the right of custody of a minor child is not in the best interests of the child." *Id.*[30] We pointed to *Knox* v. *Remick*, 371 Mass. 433, 436-437 (1976), in which we explained:

> "If a judge rules, either at the time of the entry of a judgment nisi of divorce or at any subsequent time, that the agreement was not the product of fraud or coercion, that it was fair and reasonable at the time of the entry of the judgment nisi, and that the parties clearly agreed on the finality of the agreement on the subject of interspousal support, the agreement concerning interspousal support should be specifically enforced, absent countervailing equities."

We are not persuaded that the parties' agreement is not enforceable now.

Before we explain our conclusion, we pause to comment on the standard applicable to the "second look" a judge must undertake when a party challenges the enforceability of a valid agreement. In *Osborne*, we described the standard as "fair and reasonable." *Osborne* v. *Osborne*, *supra*. In the twenty years since *Osborne* was decided, no Massachusetts appellate court has elaborated on that test, and at least one commentator has suggested that the *Osborne* second-look test is one of "conscionability." See C.P. Kindregan, Jr., & M.L. Inker, *supra* at § 20.10, at 661-662.

The nomenclature attached to the standard of review — whether it be "fair and reasonable" or "conscionability" — is but a shorthand descriptor of what is of real moment: the content and meaning behind the label, and the careful analysis required of judges, case by case, of each antenuptial agreement and the circumstances surrounding its enforcement. Indeed, whether termed "unconscionable," "fair and reasonable," "inequit-

---

[30]Custody and the support of the parties' minor children are not at issue in this case.

able," or something else, in jurisdictions that employ a "second-look" analysis, the vast majority direct trial judges to undertake an analysis that is remarkably similar in substance. Compare 1 H.H. Clark, Jr., Domestic Relations in the United States § 1.9, at 52 n.51 (2d ed. 1987) ("Unconscionability seems to be defined as occurring when enforcement of the agreement would leave the spouse without sufficient property, maintenance, or appropriate employment to support himself"), and *MacFarlane* v. *Rich*, 132 N.H. 608, 616-617 (1989) (defining "unconscionable" when "provisions in an antenuptial agreement may lose their vitality by reason of changed circumstances so far beyond the contemplation of the parties at the time they entered the contract that its enforcement would work an unconscionable hardship"), and *Miles* v. *Werle*, 977 S.W.2d 297, 303 (Mo. Ct. App. 1998), and cases cited (agreement unenforceable that attempts to "totally take from one of the spouses his or her presumed right to marital property. . . . By contrast, where an antenuptial agreement permits each spouse to retain a share of the marital property, albeit a disproportionately small one, courts are more likely to uphold and enforce the agreement"), with *Cladis* v. *Cladis*, 512 So. 2d 271, 273 (Fla. Dist. Ct. App. 1987) ("a trial court may determine that the agreement . . . does not adequately provide for the challenging spouse and, consequently, is unreasonable"), and *Button* v. *Button*, 131 Wis. 2d 84, 98-99 (1986) ("If . . . there are significantly changed circumstances after the execution of an agreement and the agreement as applied at divorce no longer comports with the reasonable expectations of the parties, an agreement which is fair at execution may be unfair to the parties at divorce").

In Massachusetts, a valid antenuptial agreement is not unenforceable at the time of divorce merely because its enforcement results in property division or an award of support that a judge might not order under G. L. c. 208, § 34, or because it is one sided. Moreover, it is not appropriate for a judge to use the same test of enforceability of an antenuptial agreement as she would for the enforceability of a separation agreement, for the

reasons explained earlier.[31] Rather, we follow the majority of courts and require that a judge may not relieve the parties from the provisions of a valid agreement unless, due to circumstances occurring during the course of the marriage, enforcement of the agreement would leave the contesting spouse "without sufficient property, maintenance, or appropriate employment to support" herself. See 1 H.H. Clark, Jr., Domestic Relations in the United States, *supra* at § 1.9. Such circumstances might include, for example, the unanticipated mental or physical deterioration of the contesting party (here the antenuptial agreement provided for full health insurance for the wife), or the erosion by inflation of agreed-on support payments to such a degree as to nullify the obvious intention of the parties at the time of the agreement's execution (here the support payments agreed to by the parties contained an adjustment for cost of living, which the wife does not claim is inadequate). The "second look" at an agreement is to ensure that the agreement has the same vitality at the time of the divorce that the parties intended at the time of its execution. See *MacFarlane* v. *Rich, supra* at 616-617.

As we noted above, we will not recognize the validity of an antenuptial agreement that essentially strips the contesting spouse of substantially all of her marital interests. For the same reason — that marriage is a special status from which certain obligations arise — we will not enforce an antenuptial agreement that prevents a spouse from retaining her marital rights, of which maintenance and support, however disproportionately small, are the most critical. See *Knox* v. *Remick*, 371 Mass. 433, 436-437 (1976). See also *Gentry* v. *Gentry*, 798 S.W.2d 928, 936 (Ky. 1990) (agreement enforceable where "the terms of the agreement were not "manifestly unfair"; agreement "did not attempt to limit or deny maintenance or support").

We have described the inquiry a judge must undertake when a party contests the enforceability of a valid antenuptial agreement. Our description gives content to, but does not depart from, the standard that has been in effect since *Osborne* v. *Osborne*, 384 Mass. 591 (1981). There we described the standard

---

[31]In this aspect of her ruling, the judge also incorrectly relied on the factors identified in *Dominick* v. *Dominick, supra*, including those enumerated in G. L. c. 208, § 34.

as "fair and reasonable." We now hold that the term "conscionability" is a more appropriate term to describe the standard at the time of enforceability. We trust that this change of nomenclature will be of assistance to judges and members of the bar, and will facilitate the recognition of the distinction between the enforceability of separation agreements and the enforceability of antenuptial agreements.

Applying the standard to the antenuptial agreement at issue here, the judge made no findings, and the wife points to no evidence, that circumstances during the marriage led to any changes of any significance: the wife suffered no debilitating illness, and she is not unable to work should she choose to supplement her income. The judge grounded her decision on three postmarriage factors: "the lifestyle of the parties during the marriage," "the vast disparity between the parties' ability to acquire future assets and income,"[32] and "the fact that this is a ten year marriage which produced two children." None is sufficient to render the agreement unenforceable. The settlement is, as the judge characterized it, "less than modest, given the financial holdings of the plaintiff." But the wife was fully apprised of the husband's holdings before she agreed to these "less than modest" arrangements.

4. *Attorney's fees.* The judge ordered the husband to pay the wife's attorney's fees. The husband challenges that aspect of the order on three grounds: (1) that the judge "lack[ed] jurisdiction" to make the order, (2) that the antenuptial agreement provides that the party in breach is liable for the parties' attorney's fees, and (3) that the judge failed to address the reasonableness of the fees. We agree with the husband as to his last claim only.

General Laws c. 208, §§ 17 and 38,[33] permit the judge to make an award of attorney's fees. Such an award is within the

---

[32]The judge noted that, during their ten years of marriage, the wife was "completely dependent on [the husband] for her financial security."

[33]General Laws c. 208, § 17, provides: "The court may require either party to pay into court for the use of the other party during the pendency of the action an amount to enable him to maintain or defend the action . . . ."

General Laws c. 208, § 38, provides: "In any proceeding under this chapter, whether original or subsidiary, the court may, in its discretion, award costs and expenses, or either, to either party, whether or not the marital relation has

DeMatteo *v.* DeMatteo.

sound discretion of the judge and will not ordinarily be disturbed. See, e.g., *Kennedy* v. *Kennedy*, 400 Mass. 272, 274 (1987) ("This matter rests in the discretion of the judge"); *Ross* v. *Ross*, 385 Mass. 30, 39 (1982), quoting *Smith* v. *Smith*, 361 Mass. 733, 738 (1972) ("[T]he award . . . may be presumed to be right and ordinarily ought not to be disturbed"). See also *Kane* v. *Kane*, 13 Mass. App. Ct. 557, 560 (1982) ("any award made [is] entitled to considerable respect on review"). The factors a judge may consider include the amount of time required to prepare the case and pleadings, the complexity of the issues involved, the value of the marital property, and the spouse's ability to pay. See *Kane* v. *Kane*, *supra* at 560-561. See also *Kennedy* v. *Kennedy*, *supra* at 274 (consideration of award should appropriately take into account important interests at stake and amount of opposition interposed by opposing party); *Goldman* v. *Roderiques*, 370 Mass. 435, 437 (1976) (in making award of attorney's fees, "the basic factors of need and relative economic positions of the spouses" must be considered). The judge was well within her discretion in ordering the husband to pay the wife's attorney's fees during the pendency of the litigation to enable her to defend the action and to contest the validity and enforceability of the antenuptial agreement.

While the order is proper, the judgment provides only that the husband "shall pay the parties' counsel fees." We remand the case to the Probate Court for a determination of the fees for the wife's attorney "not incommensurate with an objective evaluation of the services performed." *Ross* v. *Ross*, *supra* at 38-39.

5. *Conclusion.* The judgment that the antenuptial agreement is unenforceable is reversed. The judgment that the husband pay the wife's attorney's fees is affirmed. The case is remanded to the Probate and Family Court for a determination of the amount of such fees.

*So ordered.*

terminated. In any case wherein costs and expenses, or either, may be awarded hereunder to a party, they may be awarded to his or her counsel, or may be apportioned between them."