GREEN, C.J.
*335 *101 After a judge of the Probate and Family Court authorized the plaintiff's former wife, incident to their divorce, to buy out his interest in the former marital residence for one-half of its value (effectively recognizing a one-half interest in the wife), the plaintiff brought an action against the defendants for legal malpractice, claiming that his attorney failed properly to incorporate into an antenuptial agreement an agreed-upon provision *336 that would have entitled his wife to only a small fraction of the home's value. A judge of the Superior Court dismissed the complaint on the defendants' motion for summary judgment, based on the plaintiff's failure to furnish expert evidence on the issue of causation. Because the issue of causation rests on a question of law, however, no expert testimony was required. See Silva v. Norfolk & Dedham Fire Ins. Co., 91 Mass. App. Ct. 413, 420, 75 N.E.3d 1132 (2017). We accordingly vacate the judgment of dismissal.
Background. We recite the facts in the light most favorable to the plaintiff. See Niles v. Huntington Controls, Inc., 92 Mass. App. Ct. 15, 18, 81 N.E.3d 805 (2017). In the summer of 2008, after the plaintiff and Michelle Barnes decided to marry, they "collaboratively" drafted a "Google [d]oc"[2] to "identify [their] premarital assets and debts and to define [their] mutual rights and obligations regarding property and finances after" marriage. The Google doc contained a section titled "Real Estate Bought for Cash," which provided that "[i]f one partner's savings are used to purchase real estate with no mortgage, the other partner will accrue a 2.5 percent ownership interest in the real estate every year after the purchase, assuming the marriage is intact, up to a maximum ownership interest of 50 percent." The plaintiff and Barnes clarified the intended operation of the provision with an example: "A house is purchased in 2010 ... and paid for entirely from [the plaintiff's] money market funds. In the event of a divorce in 2020, [Barnes] would receive 25 percent of the value of the house. In the event of a divorce in 2030 or after, the house equity would be split 50/50."
In August 2008, Barnes hired attorney Karen Kearns to draft an antenuptial agreement based on the Google doc. The plaintiff hired the defendant Leon C. Boghossian, III, on September 8, 2008, and noted that Kearns was to "turn this Google document into a standard pre-nup." The plaintiff told "Boghossian that one of the most important terms in the Google doc was a section entitled on [sic ] 'Real Estate Bought for Cash.' "
Several drafts of the antenuptial agreement thereafter circulated among Kearns, *102 Barnes, the plaintiff, and Boghossian. The plaintiff reviewed the drafts and sent his feedback to both attorneys, but he relied on Boghossian "to create a document that implemented *337 the terms of the Google [d]oc and protected [his] interests." On October 3, 2008, the plaintiff and Barnes executed the final version of the antenuptial agreement. Article III, paragraph 12 (paragraph 12) of the antenuptial agreement -- the relevant text of which is reproduced in the margin[3] -- detailed the plaintiff's and Barnes's respective ownership interests in a principal residence acquired during the marriage in various factual circumstances.
On October 5, 2008, the plaintiff and Barnes married. Two days later, on October 7, 2008, the plaintiff used his separate property to buy a house in Lincoln for $ 1.4 million (house), taking title in his name alone. The house became the plaintiff's and Barnes's principal residence during their marriage. The couple had a baby in August 2009. Barnes filed for divorce on September 29, 2011. During the divorce proceedings, Barnes challenged the validity of the antenuptial agreement. A Probate and Family Court judge (probate judge) found the antenuptial agreement valid, and determined *338 that paragraph 12(c)(iv) (rather than paragraph 12[a] ) applied to the couple's respective rights in the house, because the couple had a minor child and both the plaintiff and Barnes wished to retain the house. The probate judge ordered that Barnes could buy out the plaintiff's interest in the house for $ 727,500.[4] Had the provisions of paragraph 12(a) (which incorporated the equity accrual provisions set forth in the Google doc) been applied, Barnes's interest in the house would have been only 7.5 percent, instead of fifty percent. Barnes completed her purchase of the plaintiff's interest in the house *103 by making the $ 727,500 payment in July 2014.[5]
On March 30, 2015, the plaintiff filed a complaint for, among other claims, legal malpractice against Boghossian and his law firm, asserting that the plaintiff had purchased the house, with cash, from his own property, two days after the wedding, "[r]elying on [his] understanding from Attorney Boghossian that any potential division of the asset would be governed by the 2.5 percent annual accrual provision," and that, had the antenuptial agreement been drafted as he instructed -- that is, had it "implemented the terms of the Google [d]oc" -- Barnes would have received only 7.5 percent of the value of the house, rather than fifty percent. Had the plaintiff known that the antenuptial agreement did not "protect[ ] [his] interests," he would have "purchased the home in Lincoln prior to the marriage and refrained from solely purchasing any real estate subsequent to the wedding."
The defendants moved for summary judgment and, after a hearing, a judge of the Superior Court (motion judge) allowed the motion, based on the absence of expert evidence on the issue of causation.[6] This appeal followed.
*339 Discussion. 1. Standard of review. "We review a grant of summary judgment de novo," without deference to the motion judge's reasoning, "to determine 'whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law' " (citation omitted). Niles, 92 Mass. App. Ct. at 18, 81 N.E.3d 805. "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass. R. Civ. P. 56 (c), [as amended, 436 Mass. 1404 (2002),] unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716, 575 N.E.2d 734 (1991).
2. Legal malpractice. "To prevail on a claim of negligence by an attorney, a client must demonstrate that the attorney failed to exercise reasonable care and skill in handling the matter for which the attorney was retained ...; that the client has incurred a loss; and that the attorney's negligence is the proximate cause of the loss." Global NAPs, Inc. v. Awiszus, 457 Mass. 489, 500, 930 N.E.2d 1262 (2010), quoting Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass. App. Ct. 107, 111, 515 N.E.2d 891 (1987). In the present case, the motion judge observed that the plaintiff's expert would testify that "Boghossian breached the requisite standard of care as to some of his duties to his client," and rested her order allowing the defendants' summary judgment motion solely on the absence of expert evidence on the issue of causation.
"The principles and proof of causation in a legal malpractice action do not differ from those governing an ordinary *104 negligence case" (citation omitted). Girardi v. Gabriel, 38 Mass. App. Ct. 553, 557, 649 N.E.2d 805 (1995). 1 R.E. Mallen, Legal Malpractice § 8:20, at 1055 (2019 ed.). The causation element requires a plaintiff to prove that he "probably would have obtained a better result had the attorney exercised adequate skill and care." Kiribati Seafood Co., LLC v. Dechert LLP, 478 Mass. 111, 117, 83 N.E.3d 798 (2017), quoting Global NAPs, Inc., 457 Mass. at 500, 930 N.E.2d 1262. See Baghdady v. Lubin & Meyer, P.C., 55 Mass. App. Ct. 316, 321, 770 N.E.2d 513 (2002). See also Gilbert v. Williams, 8 Mass. 51, 57 (1811) ("whenever an attorney disobeys the lawful instructions of his client, and a loss ensues, for that loss the attorney is responsible").
"Generally, the question what the probable outcome would have been had the attorney acted reasonably is determined by a *340 'trial within a trial,' in which a new trier of fact decides both whether the attorney was negligent and what the outcome of the [underlying] litigation would have been in the absence of negligence." Kiribati Seafood Co., LLC, 478 Mass. at 117, 83 N.E.3d 798, citing Fishman v. Brooks, 396 Mass. 643, 647, 487 N.E.2d 1377 (1986). The new factfinder "does not attempt subjectively to determine what the earlier trier of fact would have done; ... [r]ather, the new trier of fact makes an independent determination as to what reasonably would have been the outcome of the earlier trial in the absence of negligence, based on the applicable law and the evidence presented at the new trial." Id.
As part of the "trial within a trial" in a legal malpractice case, a plaintiff may need expert witnesses. See, e.g., Global NAPs, Inc., 457 Mass. at 500, 930 N.E.2d 1262. In particular, "[e]xpert testimony is generally necessary to establish that an attorney failed to meet the standard of care." Id. [7]
However, "[i]n a legal malpractice action, expert testimony on issues of law should be precluded," 4 R.E. Mallen, Legal Malpractice § 37:132, at 1897, because "an opinion of law" is generally "not a proper subject for expert testimony."[8] Silva, 91 Mass. App. Ct. at 420, 75 N.E.3d 1132. See Leavitt v. Mizner, 404 Mass. 81, 88-92, 533 N.E.2d 1334 (1989) (deciding, as matter of law, that attorney's alleged negligence could not have caused harm); Fishman, 396 Mass. at 650, 487 N.E.2d 1377, citing Perry v. Medeiros, 369 Mass. 836, 842, 343 N.E.2d 859 (1976) (expert testimony on existence of ethical violation is improper as judge can instruct regarding requirements of ethical rules). "[I]f causation depends on a legal ruling" in the underlying action, then "the issue usually presents a question of law." 4 R.E. Mallen, Legal Malpractice § 37:105, at 1811. See McConnico, Knauth, & Bigelow, Unresolved Problems in Texas Legal Malpractice Law, 36 St. Mary's L.J. 989, 1000 (2005).
Expert testimony "on how [a] jurist would have decided an issue is improper and inadmissible." 4 R.E. Mallen, Legal Malpractice § 37:150, at 1947. See Silva, 91 Mass. App. Ct. at 420, 75 N.E.3d 1132 (proffered expert testimony was improper because it offered legal *341 conclusion on *105 whether conduct violated G. L. c. 93A). See also Brewer, Jr., Expert Witness Testimony in Legal Malpractice Cases, 45 S.C. Law Rev. 727, 762 (1994) (explaining that expert may not testify as to legal conclusions because "such testimony invades the court's province" [quotation and citation omitted] ). For this reason, expert testimony is only "[o]ccasionally" appropriate "on the issue[ ] of ... causation" in legal malpractice cases, despite usually being required to prove duty and breach. See 4 R.E. Mallen, Legal Malpractice § 37:120, at 1842. See, e.g., Leavitt, 404 Mass. at 88-92, 533 N.E.2d 1334 ; Pongonis v. Saab, 396 Mass. 1005, 1005, 486 N.E.2d 28 (1985).
In the present case, the "trial within a trial" on the issue of causation would examine whether the antenuptial agreement would have been determined to be valid and enforceable in the underlying divorce proceeding had it been drafted as the plaintiff instructed, based on an assessment of its fairness, reasonableness, and conscionability. See DeMatteo v. DeMatteo, 436 Mass. 18, 26-38, 762 N.E.2d 797 (2002).[9] Such questions of contract interpretation, validity, and enforceability are questions of law for a judge. See Goddard v. Goucher, 89 Mass. App. Ct. 41, 46-47, 44 N.E.3d 878 (2016). Because they are legal questions, expert testimony not only is not required; it is not admissible. See Silva, 91 Mass. App. Ct. at 420, 75 N.E.3d 1132. See also 4 R.E. Mallen, Legal Malpractice § 37:150, at 1947. It accordingly was error to conclude, under Kourouvacilis, 410 Mass. at 716, 575 N.E.2d 734, that the plaintiff had no reasonable expectation of proving an essential element of his case at trial by reason of the absence of expert evidence on the issue of causation.
Viewed in the light most favorable to the plaintiff, the plaintiff hired Boghossian "to represent [his] interests in connection with the drafting and execution" of the antenuptial agreement with *342 Barnes. The plaintiff told Boghossian that drafting the antenuptial agreement should not be a "renegotiat[ion]" of the Google doc, as "[t]he project was to put the appropriate legal language around the agreement between the parties." The plaintiff expected that Boghossian "would read" the antenuptial agreement "to make sure that the legal effect, the legal terms of the [antenuptial agreement] were either in [the plaintiff's] interests or reflected to the extent that anything wasn't in [the plaintiff's] interest, that they would at least be something that [the plaintiff] had affirmatively conceded via the Google [d]oc agreement." If, as the plaintiff contends, the antenuptial agreement would have been determined valid if drafted in strict accordance with the equity accrual provisions of the Google doc, the nexus between its variance from the Google doc and the loss of equity suffered by *106 the plaintiff under the buyout ordered by the probate judge is clear.[10]
Conclusion. We conclude that the motion judge erred in ruling that the plaintiff was required to present expert evidence on the issue of causation in the form of an opinion that the antenuptial agreement would have been determined valid if drafted in accordance with the equity accrual provisions set forth in the Google doc.[11] We therefore vacate the judgment and remand for additional proceedings consistent with this opinion.
So ordered.

"Google Documents is an Internet-based application that allows users to upload, edit, store, and download any type of document. Users can also give other users access to documents." National Labor Relations Bd. v. Klochko Equip. Rental Co., 657 Fed. Appx. 441, 444 n.2 (6th Cir. 2016).

"a. If one party contributed solely from their respective Separate Property to the acquisition of the principal residence, and no mortgage was obtained by the parties to acquire the principal residence, then the other party will accrue a 2.5 percent ownership interest in the principal residence for every year following the purchase, during the marriage, up to a maximum ownership interest of fifty (50) percent, at which time the principal residence will be owned by the parties as the joint property of the parties, as defined herein.
"b. If the parties acquire the principal residence by mortgage financing, then mortgage payments shall be made by each of the parties in proportion to their 'taxable income' (defined as gross income minus deductions; for example, that amount which is reported on 2007 I.R.S. Form 1040, Line 43) as reported on their prior year's Federal income tax return. Said principal residence will be owned by the parties as the joint property of the parties, as defined herein.
"c. In the event that either party files an action for separation, separate support or divorce during marriage, the parties agree to the following disposition of the principal residence: (i) If neither party wishes to retain the principal residence .... (ii) If only one party wishes to retain the principal residence .... (iii) If the parties cannot agree upon the fair market value .... (iv) If a child or children of the marriage have not yet graduated from high school, and both parties wish to retain the principal residence and the parties cannot agree as to the disposition of such property, then the parties will make every effort to determine what is in the child or children's best interests, resolving any buyout equitably by the parent who wishes to remain in the principal residence with the child or children. If the parties cannot agree to the terms of vacating by one parent and/or an equitable buy-out of one parent, the parties agree to submit to the mediation process as described below. If mediation is unsuccessful in resolving the issues of vacating and buy-out of the principal residence, the parties agree to submit themselves to the Probate and Family Court for resolution."

The buyout price was based on the probate judge's conclusion that, pursuant to paragraph 12(c)(iv) of the antenuptial agreement, an equitable buyout price would be one-half of the agreed-upon value of the house ($ 1.455 million).

The divorce judgment was appealed to this court and affirmed on July 13, 2015. Greenspun v. Greenspun, 87 Mass. App. Ct. 1135, 2015 WL 4173428 (2015).

The motion judge reasoned that the plaintiff had the burden to establish that the antenuptial agreement would have been ruled valid and enforceable if it had incorporated the limited equity accrual provisions set forth in the Google doc without the modifications incorporated in the agreement ultimately signed by the parties, and that without such a showing he could not show that any loss resulting from application of the agreement as drafted was caused by Boghossian's negligence.

As we have observed, supra, the motion judge recognized that the plaintiff's expert would testify that Boghossian failed to meet the standard of care.

The United States Court of Appeals for the District of Columbia succinctly explained why expert testimony on issues of law is improper: "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997).

Before enforcing an antenuptial agreement, a judge must determine whether the agreement is valid at execution based on (1) its fairness and reasonableness to the contesting party, (2) whether the contesting party was fully informed (or otherwise aware) of the other party's worth, and (3) whether the contesting party set forth a waiver of his rights. DeMatteo, 436 Mass. at 26, 762 N.E.2d 797. "It is only where the contesting party is essentially stripped of substantially all marital interests that a judge may determine that an antenuptial agreement is not 'fair and reasonable' and therefore not valid." Id. at 31, 762 N.E.2d 797. After a judge finds an antenuptial agreement valid, he must take a "second look" to determine its enforceability at the time of divorce (citation omitted). Id. at 34-36, 762 N.E.2d 797. This conscionability analysis, much like the first look, examines whether "enforcement of the agreement would leave the contesting spouse 'without sufficient property, maintenance, or appropriate employment to support' herself." Id. at 37, 762 N.E.2d 797, quoting 1 H.H. Clark, Jr., Domestic Relations in the United States § 1.9, at 52 n.51 (2d ed. 1987).

The defendants contend that the motion judge's ruling may be affirmed on the alternative ground that the summary judgment record does not establish that Barnes would have agreed to the antenuptial agreement if it had been drafted in strict accordance with the equity accrual provision described in the Google doc. To that argument, the plaintiff offers two responses. First, the plaintiff observes, Barnes in fact did agree to that very provision in the Google doc itself, furnishing at least some evidence of her willingness to accept it. Second, and cited by the plaintiff as an independent ground to reverse the summary judgment, even if modification of the equity accrual provisions was necessary in order to gain Barnes's agreement, had Boghossian fully and correctly explained the change to the plaintiff he could have closed on his purchase of the house before his marriage to Barnes, instead of two days after they married.

The motion judge summarily allowed the defendants' motion for summary judgment as to the plaintiff's other claims, stating that the plaintiff's "lack of expert evidence of causation is fatal to his other claims arising from the same underlying conduct." Because we conclude that the plaintiff did not need an expert to establish causation, the motion judge's order allowing summary judgment as to these claims is vacated, and the matter is remanded as to them.