JAY S. KORFF *vs.* JILL R. KORFF
(and a companion case[1]).

No. 04-P-1212.

Middlesex. April 15, 2005. - July 22, 2005.

Present: KANTROWITZ, DOERFER, & COHEN, JJ.

*Divorce and Separation,* Alimony. *Contract,* Antenuptial agreement.

This court concluded that once a Probate and Family Court judge determined that an antenuptial agreement was valid, it was improper for the judge to alter its alimony provisions. [97-99]

COMPLAINTS for divorce filed in the Middlesex Division of the Probate and Family Court Department on February 28 and December 26, 2002.

The cases were heard by *Spencer M. Kagan,* J.

*Elizabeth A. Zeldin (Suzanne T. Mancuso* with her) for Jay S. Korff.

*Nancy A. Freed (Peter A. Kuperstein* with her) for Jill R. Korff.

KANTROWITZ, J. Once it was determined that an antenuptial agreement was valid, it was improper for the Probate and Family Court judge to alter its alimony provisions.[2]

*Facts.* The parties were married on March 29, 1992, two days after signing an antenuptial agreement (agreement) that provided, in part, that in case of divorce, alimony was to be determined annually, based upon the husband's gross income multiplied by a percentage that was determined by the length of the marriage. If, for example, the marriage lasted from sixty-one through 120 months, the wife would be entitled to sixteen

---

[1]Jill R. Korff *vs.* Jay S. Korff.

[2]The husband also claims that the award of attorney's fees to the wife was error. We disagree and affirm that aspect of the judgment. See G. L. c. 208, §§ 17, 38; *DeMatteo* v. *DeMatteo,* 436 Mass. 18, 38-39 (2002).

percent of the husband's gross income; if it lasted from 121 through 180 months, the percentage would rise to twenty-one percent. The agreement provided that the end of the marriage would be "[u]pon the filing of a Complaint for Divorce."

On February 28, 2002, the husband filed, but did not serve, a complaint for divorce in the Probate and Family Court. The husband did not tell the wife that he had filed for divorce, and, in fact, the couple continued to live together as husband and wife until December 26 of that year, when the wife filed and served her own complaint for divorce.[3]

The first issue thus litigated was the true date of the divorce filing: February 28, 2002, as the husband claimed (thus setting the marriage length at 119 months, entitling the wife to sixteen percent of the husband's gross annual income) or December 26, 2002, as the wife claimed (which resulted in a marriage length of 129 months, entitling the wife to a twenty-one-percent share). The judge found that the controlling date was December 26, 2002, thus establishing the alimony provision at twenty-one percent.[4]

Despite some mild protestations by the wife, the validity of the agreement was never really at issue, and the judge, after hearing some evidence on the subject, quickly turned to the question of alimony.[5] The husband was a financial advisor at Morgan Stanley and his income, based primarily on commission

---

[3]The husband served the wife with his divorce complaint on June 19, 2003, two days after the wife served the husband with a motion to dismiss his divorce complaint.

[4]The judge found that the "Husband did not present sufficient or credible evidence of any nature as to why he did not serve the Wife a Domestic Relations Summons, within 90 days of February 28, 2002, as required under Massachusetts law." The husband also admitted that he filed the complaint in February, 2002, to "preserve the percentage of assets that would be awarded to the Wife under the Agreement." The husband is not appealing this finding. Indeed, in his prayer for relief he asks us to "order Jay to pay to Jill a sum equal to 21% of Jay's gross income."

[5]In spite of his appropriate observation that "the existence of a valid Antenuptial Agreement obviates the need for the Court to consider the statutory factors under G. L. c. 208, § 34," the judge, nevertheless, undertook a detailed analysis of those factors for the purported purposes of "interpreting the parties['] Agreement and determining an appropriate level of child support." The factors of G. L. c. 208, § 34, are inapplicable considerations either in determining the validity of an antenuptial contract or in the interpretation of a

and deferred production bonuses, varied substantially from year to year.[6] His college-educated wife worked part-time in magazine advertising sales, earning, on a commission basis, $97,959 in 2003 and $38,252 in 2002.

As explained above, the agreement provided that alimony was to be based upon a yearly percentage of the husband's gross income.[7] Rather than adhere to this provision in the contract, however, the judge proceeded to modify it based upon his finding that the husband "has no financial credibility."[8] For that reason, the judge ordered a fixed annual amount of alimony, based on the "average over the last five years of the Husband's gross income," arriving at an average gross income figure of $926,725.50.[9] The wife was, therefore, to be paid a monthly sum of $14,625.24 until the agreement terminated.[10] The judge also ordered attorney's fees and costs in the amount of $25,000 to the wife.[11]

valid antenuptial contract. See, e.g., *DeMatteo* v. *DeMatteo*, 436 Mass. at 31 ("[A]n antenuptial agreement need not approximate an alimony award . . . a judge would be required to make under G. L. c. 208, § 34. Judged by those statutory requirements, the parties' right to settle their assets as they wish would be meaningless"). Furthermore, child support is controlled by G. L. c. 208, § 28, and the Massachusetts Child Support Guidelines.

[6]He earned, in 1998, $903,652.91; in 1999, $1,346,909.51; in 2000, $1,590,450.19; in 2001, $1,426,528.23; in 2002, $547,618.10; and in 2003, through October 31, $430,028.98.

[7]Gross income was defined as "all income earned in a given year whether from declared or deferred compensation, excluding deferred compensation earned in a prior year but elected to be taken in the current year, minus any child support paid by [the husband]."

[8]This finding was based on the husband's failure to list residual income and other assets, including a one-quarter share of his mother's house, which she deeded to her sons in 1998, leaving a life estate for herself. As for the drop in income the last two years, the judge found that the husband "intentionally, either voluntarily directly or indirectly reduced his income to reduce his exposure to the proper amount of alimony and child support." There is scant direct evidence on this point. Indeed, the only evidence appears to be to the contrary, i.e., that he lost a major account and the stock market declined.

[9]That figure excluded the husband's production bonus, which the judge considered "deferred compensation" under the agreement. This was not raised as an issue on appeal.

[10]Under the agreement, the alimony obligation would terminate upon (1) the husband's death; (2) the wife's death; (3) the wife's remarriage; or (4) after a period of time equal to the length of the marriage — in this case, 129 months (10 years, 9 months).

[11]The judge also ordered, in accordance with the agreement, arbitration on the division of assets, as well as child support. Neither issue is contested here.

On appeal, the husband argues that as the agreement was valid and enforceable, the judge was obligated to enforce its terms as written. Therefore, the creation of a fixed alimony payment based on an average of the husband's gross income was effectively a modification of the alimony provision, and in error. We agree.

*Discussion.* As the validity of the agreement is not an issue before us, we need not discuss it at length. Suffice it to say that in determining the validity of an antenuptial agreement, the judge must undertake a dual-pronged inquiry. First, he must establish whether the agreement was " 'fair and reasonable,' at the time of execution." *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 30 (2002), quoting from *Rosenberg* v. *Lipnick*, 377 Mass. 666, 672 (1979). Next, taking a "second look," the judge must inquire whether the agreement, at the time of the divorce, is "conscionable." *DeMatteo* v. *DeMatteo, supra* at 34, 38. Under the conscionability standard, "a judge may not relieve the parties from the provisions of a valid [antenuptial] agreement unless, due to circumstances occurring during the course of the marriage, enforcement of the agreement would leave the contesting spouse 'without sufficient property, maintenance, or appropriate employment to support herself.' " *Id.* at 37, quoting from 1 Clark, Jr., Domestic Relations in the United States § 1.9 (2d ed. 1987).

In the instant matter, the judge found the agreement to be valid and enforceable not only at the time of execution, but also at the time of the divorce. Neither party contests this holding, nor do we find it to be in error.[12] Notwithstanding this conclusion, however, the judge modified the alimony provision based on his finding that the husband lacked financial credibility. Thus, anticipating ongoing, future, annual breaches by the husband, the judge instituted preventive measures by fixing a set amount of alimony to be paid over the life of the agreement, in direct conflict with its clear language that alimony was to be determined annually. Although, based on the record, the judge's displeasure with the husband's conduct is understandable (e.g.,

---

[12]Even considering the husband's lowest year of income, $430,028.98 for part of 2003, the wife would have been entitled to at least $90,306.09, leaving her with sufficient support under the parameters of *DeMatteo*.

his treatment of Jill, including subjecting her to vile name-calling and physical force, his failure to disclose assets in his financial statements, and his covert filing and failure to serve his complaint for divorce), the solution was, nonetheless, legally impermissible.

The agreement called for alimony to be adjusted on an annual basis, the wife receiving twenty-one percent of the husband's gross income, as defined in the agreement. While the agreement does not provide a formal mechanism for the parties to agree upon the calculation of gross annual income[13] and alimony readjustment, the parties would be wise, in the future, to arrange one. While we are remanding this matter for a determination of the husband's alimony obligation for the year in question, in the future that figure will have to be determined anew on an annual basis. If the parties cannot agree as to how that figure is to be calculated, or if the wife is dissatisfied with the method employed by the husband, she is free to return to court for an accounting, a legal determination of the amount owed, or a complaint for contempt or breach of contract, including a breach of the duty of good faith and fair dealing. See, e.g., *DeCristofaro* v. *DeCristofaro*, 24 Mass. App. Ct. 231, 234-237 (1987); *Larson* v. *Larson*, 37 Mass. App. Ct. 106, 109-110 (1994). A judge would be free, among other options, to appoint a master under Mass.R.Dom.Rel.P. 53 (1997), or to assess attorney's fees and costs if deemed appropriate, as allowed by article IV(B)(4) of the agreement.

*Conclusion.* So much of the judgment of divorce as pertains to alimony is vacated. The matter is remanded for a determination, consistent with this opinion, of the appropriate alimony for the period in question.[14] Whether to reopen the evidence is

---

[13]This is not a case of self-employment with a possibility of hiding assets. The husband here is employed by Morgan Stanley, and his income and benefits can be, it appears, readily ascertainable. The more troublesome area is when a husband has the ability to generate income but does not. See generally *Schuler* v. *Schuler*, 382 Mass. 366, 373-374 (1981); *Bassette* v. *Bartolucci*, 38 Mass. App. Ct. 732, 735-736 (1995); *Flaherty* v. *Flaherty*, 40 Mass. App. Ct. 289, 291 (1996). Whatever remedies that might be fashioned in such a case do not include the rewriting of a valid antenuptial agreement.

[14]In light of our holding, we do not reach the husband's claims of error as to the judge's factual findings. Virtually all of the factual findings at issue relate to the improper modification of the agreement.

within the judge's discretion.[15] The wife's request for appellate counsel fees is denied. Although we vacate the order for support, the present terms are to remain in effect temporarily pending new orders by the Probate and Family Court judge.

*So ordered.*

---

[15]The husband was not allowed to call his supervisor as a witness, apparently due to late notice to the wife that he would be testifying. It appears that if the evidence were reopened, the supervisor would be able to shed light in the area of the husband's earnings. See note 8, *supra.*