LINDA S. EYSTER vs. JAN A. PECHENIK.

No. 06-P-1578.

Suffolk. January 4, 2008. - May 23, 2008.

Present: BERRY, KAFKER, & MILLS, JJ.

*Contract,* Antenuptial agreement. *Husband and Wife,* Antenuptial agreement. *Waiver. Practice, Civil,* Appeal, Motion to amend, Notice of appeal. *Notice,* Timeliness. *Probate Court,* Appeal.

This court exercised its discretion under Mass.R.A.P. 14(b) to enlarge the time for filing a notice of appeal, nunc pro tunc, from the judgment in a divorce case, rendering the wife's appeal timely despite a two-month delay in filing the notice (which constituted the wife's third notice of appeal — her first notice of appeal was untimely, given that it was filed simultaneously with a motion to amend the judgment, and the register's office had failed to docket the wife's second notice of appeal in a timely fashion, because the notice was lost during the pendency of the wife's motion to amend the judgment), where the wife's underlying appeal, fully briefed and argued by both parties, raised meritorious appellate issues; where she established good cause for failing to file a timely appeal in light of all the circumstances; where allowing the appeal to proceed was consonant with policy concerns; and where the husband had not been prejudiced. [779-782]

A probate judge erred in determining that a prenuptial agreement was valid, where the agreement contained no express waiver of marital rights, and where neither the agreement's express language nor any other extrinsic evidence demonstrated that the parties sufficiently understood their marital rights and how they were altering them. [782-787]

COMPLAINT for divorce filed in the Middlesex Division of the Probate and Family Court Department on March 1, 2004.

The case was heard by *Spencer M. Kagan,* J., and motions to amend the judgment and to dismiss an appeal were heard by him.

A motion for leave to file a late notice of appeal was considered in the Appeals Court by *Cypher,* J.

*Wendy H. Sibbison* for the plaintiff.

*John A. Moos* (*Amanda Baker Wright* with him) for the defendant.

KAFKER, J. The defendant, Jan A. Pechenik, drafted his own prenuptial agreement. His prospective wife, the plaintiff, Linda S. Eyster, signed the agreement shortly before their wedding. Neither of the parties, who had advanced degrees in biology, sought or received prior legal counsel. The agreement did not contain an explicit waiver of marital rights or demonstrate an understanding of those rights in the absence of the agreement. A judge of the Probate and Family Court found the agreement valid and the plaintiff's appeal untimely. We reverse and remand.

1. *Background.* The following facts, found by the probate judge after trial, are relevant to the present appeal.

a. *Facts pertaining to prenuptial agreement.* The appellant Linda S. Eyster (wife) and the appellee Jan A. Pechenik (husband) signed a prenuptial agreement dated July 12, 1982, five days before their wedding on July 17, 1982. The husband drafted the agreement after reading articles in financial magazines and newspapers and at least one book from a local bookstore. Neither party consulted an attorney before signing the agreement. The one-page agreement, laid out in the margin,[1] pertained mainly to the distribution of financial assets and property owned by the

---

[1]"This agreement is entered into between Linda Sue Eyster (Lindy) of Cambridge, Massachusetts, and Jan A. Pechenik of Cambridge, Massachusetts. In anticipation of their marriage, now scheduled for July 17, 1982, they agree to the following:

"1. Neither will have any claim on the financial assets of the other (other than right of survivorship). This includes:

a. Bank accounts held individually

b. Money market funds and similar financial instruments held individually

c. Stocks held individually, with the exception of stocks purchased jointly but registered individually. . . .

"2. The house in which we will live at 1578 Cambridge Street was purchased by Jan. On the other hand, Lindy will continue to help maintain the property and will continue to help pay the taxes and the mortgage. It is felt that Lindy should therefore acquire financial interest in the property over time. In the event of separation or divorce, Lindy has financial interest in the profit from the sale of our home at 1578 Cambridge Street as follows:

a. 10% in the first year of our marriage

parties, with a gradual acquisition of financial interest by the wife in the property on 1578 Cambridge Street. Alimony and child support were not mentioned in the agreement.[2]

At the time of signing the agreement, the husband was thirty-two years of age and had a Ph.D. in biology from the University of Rhode Island.[3] The wife was twenty-nine years of age and was in the process of receiving her Ph.D. in biology from Northeastern University.[4] The parties had been living together for two years and co-owned a one-week timeshare. The wife also owned stocks that were held by the husband in his brokerage account. The husband and wife had approximately equal assets. The husband's condominium, discussed in the agreement, was the most valuable asset.

The judge found that the wife "had several months to consult with an attorney before her voluntary execution of the agreement." The wife "believed that property owned at the time of the marriage was to be retained by the person owning it at that time, and that gifts and inheritances acquired after the marriage

---

> b. 15% in the second year of our marriage
>
> c. 5% additional in each succeeding year of our marriage, to a maximum of 50%.
>
> "3. Neither of us makes any claim on any other property (including gifts) held or contributed individually by the other.
>
> "4. In case of separation or divorce, neither party will have any claim on more than 50% of any other assets purchased jointly during the marriage.
>
> "5. Each is satisfied that a full and fair disclosure of property interests has been made prior to the marriage.
>
> "6. This agreement is effective as of the date of the marriage of the parties, whether it be in July 1982 as now planned or at some other date. If the marriage should unexpectedly not occur within one year, this contract shall terminate unless revived.

"Executed by both parties on July 12, 1982. [Signed and witnessed.]"

[2] The couple had a son, Oliver, who was born on September 4, 1987.

[3] The husband had also received a master's degree from the Massachusetts Institute of Technology, and a bachelor's degree in biology from Duke University.

[4] The wife had received a master's degree from the University of South Carolina, and a bachelor's degree from the University of Louisiana.

would be retained by the recipient and not become part of the marital estate."

During their marriage, both parties essentially maintained separate financial lives. Gifts and inheritances from parents were held in separate accounts by each party, and only four of their more than thirty accounts were held jointly. Their joint assets were valued at less than eight percent of their total assets. Throughout the marriage, the parties kept a running "tab" tallying the debts owed to each other.

On March 1, 2004, after almost twenty-two years of marriage, the wife filed for divorce in the Middlesex Division of the Probate and Family Court Department (Middlesex Probate Court). At the time of the divorce, the wife's net worth totaled $852,376.76 and the husband's net worth was $2,368,468.03. In her divorce complaint, the wife sought a declaration that the prenuptial agreement was void. The husband's answer and counterclaim sought specific enforcement of the agreement. The wife filed a second complaint, for declaratory judgment, on April 1, 2005, seeking either a specified interpretation of the agreement or a declaration that the agreement was null and void. That same day, the complaint for divorce and the complaint for declaratory judgment were consolidated. After trial, in a combined judgment entered March 3, 2006, on the divorce complaint, the counterclaim, and the complaint for declaratory judgment, the probate judge declared the prenuptial agreement enforceable. In the accompanying memorandum of decision, the judge stated:

> "An enforceable agreement must also include a valid waiver. . . . In determining whether this requirement is met, the court may consider the parties' opportunity to consult counsel, the disclosure of assets and the circumstances surrounding execution of the agreement. . . . Both parties voluntarily and freely chose not to utilize the services of an attorney in negotiating, preparing or executing the agreement. While in hindsight they may now agree with the oft-repeated adage that a fool has himself as his lawyer, this hardly invalidates the agreement. The parties engaged in negotiations about the terms and implications of the agreement, had sufficient time to review the document, it was not fraudulently procured or the product of duress and

was properly executed. . . . A waiver will be found when, as here, the circumstances demonstrate that 'wife recognized that marriage conferred certain rights, and that she waived those rights by signing the agreement.' "

b. *Facts pertaining to timeliness of the appeal.* On March 13, 2006, the wife filed a timely motion to amend the judgment (pursuant to Mass.R.Dom.Rel.P. 52[b] and 59) and a notice of appeal from the judgment. The notice of appeal was deemed untimely because of the pendency of the wife's motion to amend. On April 7, 2006, the probate judge endorsed the wife's motion to amend, allowing it in part and denying it in part.[5]

The wife filed a second notice of appeal on April 11, 2006.[6] As explained in a memorandum prepared by an assistant register of the Middlesex Probate Court register's office, docketed and submitted to the judge,[7] the register's office "determined that the second Notice of Appeal dated April 11, 2006 was timely since it was received after the April 7, 2006 decision on the Motion to Amend, but that it could not be filed until after entry on the docket of the Order on the Motion to Amend dated April 7, 2006." The order on the motion to amend was docketed on April 28, 2006, but by that time "the second Notice of Appeal was lost [by the register's office] and not processed by the Appeals Department." The wife's counsel continued to prosecute the appeal until July of 2006, when a "Notice of Intent to Dismiss Appeal" was issued (regarding the first notice of appeal) and counsel for both parties and the register's office became aware of the missing second notice of appeal.

The register's office asked for and received another copy of the notice of appeal from the wife's counsel on July 25, 2006[8]

---

[5]The partial allowance of the motion merely corrected an erroneous docket number appearing on the judgment.

[6]Apparently, the register's office had mailed a copy of the endorsed motion to the wife's counsel.

[7]During the hearing on the motion to dismiss the wife's appeal the judge said, "I'm also in receipt of a memo to the — filed by the Appeals Department of this court."

[8]The record is unclear whether the receipt of this notice of appeal actually occurred some days prior to July 25, the day it was docketed. For convenience, we shall treat July 25 as the day of receipt. Nothing of consequence turns on our doing so.

(third notice of appeal), and marked it as "rec'd April 14, 2006," and "filed May 1, 2006," a timely date. As explained in the assistant register's memorandum:

> "I requested that [the appeals clerk] have a copy of the Notice of Appeal forwarded to the Court and be file-dated so that the Court's error would not unduly prejudice the filing party. [The appeals clerk] subsequently filed the Notice of Appeal dated April 11, 2006 as of May 1, 2006 and entered it onto the docket on July 25, 2006."

On August 11, the husband filed a motion to dismiss the wife's appeal, asserting that it was untimely because no notice of appeal was filed within thirty days of April 28, 2006. After a hearing, the judge issued a written decision on September 14, 2006, to grant the defendant's motion to dismiss the appeal. In this decision, the probate judge, without addressing the assistant register's memorandum, explained:

> "While this Court is deeply concerned about preserving appellants' rights, there are also procedural irregularities in this case which support a dismissal . . . . *It is not clear how or when a copy of the Wife's second appeal with a handwritten notation 'filed May 1 2006' came to be in the possession of the Register's office.* The only facts which the Court can ascertain with regard to the second appeal are that it was filed on April 11, 2006 and docketed on July 25, 2006." (Emphasis added.)

As he declined to recognize the May 1, 2006, filing date, the judge found the appeal untimely as filed too early.[9] The wife timely noticed an appeal from the order dismissing her appeal.

Meanwhile, the wife also sought relief through a single justice of this court, moving on October 6, 2006, for leave to file a new, late notice of appeal. The single justice denied the motion on the basis that "the proper appellate route from the dismissal of an appeal is an appeal to the full court of the Appeals Court." *Catalano* v. *First Essex Sav. Bank,* 37 Mass. App. Ct. 377, 383

---

[9]The probate judge's decision did not specifically address the timeliness of the third notice of appeal, noting only that the prior two notices, filed on March 13 and April 11, were untimely and that the wife had failed to seek a time extension under Mass.R.A.P. 4(c).

(1994). The wife's appeal to this panel of the single justice's order has been consolidated with the appeal from the probate judge's order dismissing her appeal from the judgment.

2. *Procedural issues.* Ordinarily a notice of appeal must be filed "within thirty days of the date of the entry of the judgment appealed from." Mass.R.A.P. 4(a), as amended, 430 Mass. 1603 (1999).[10] It is well settled that a timely filed motion to amend the judgment operates to toll the appeal period, and a notice of appeal filed between the entry of the judgment and the disposition of the motion to amend is a nullity. See Mass. R.A.P. 4(a); *Anthony* v. *Anthony,* 21 Mass. App. Ct. 299, 300-302 (1985); *Sawyer* v. *Sawyer,* 66 Mass. App. Ct. 906 (2006). The parties correctly do not dispute that the notice of appeal filed on March 13, 2006, simultaneously with the motion to amend, was of no effect.

The initial issue presented here concerns the effect, if any, of a notice of appeal filed after the disposition of a motion to amend, but before the entry of the disposition on the trial court docket. This nuance of the rule has not been previously construed by our court. We agree with the probate judge that, in accordance with the plain language of Mass.R.A.P. 4(a), such a notice is untimely and has no effect. While the rule specifically indicates that "a notice of appeal filed before the *disposition* of [a motion to amend] shall have no effect" (emphasis supplied), it also provides that "[a] new notice of appeal must be filed within the

[10]Rule 4(a) reads in relevant part as follows:

"Appeals in Civil Cases. In a civil case, unless otherwise provided by statute, the notice of appeal . . . shall be filed with the clerk of the lower court within thirty days of the date of the entry of the judgment appealed from . . . .

"If a timely motion under the Massachusetts Rules of Civil Procedure is filed in the lower court by any party: (1) for judgment under Rule 50(b); (2) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (3) under Rule 59 to alter or amend a judgment; or (4) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above."

prescribed time *measured from the entry of the order* disposing of the motion" (emphasis supplied). Mass.R.A.P. 4(a), as amended, 393 Mass. 1239 (1985).[11] As the plain language of the rule requires that the notice of appeal be filed within thirty days of the *entry* of the disposition of the motion on the trial court docket, the second notice of appeal filed on April 11, 2006, was also untimely and of no effect.[12]

The third notice of appeal, filed after counsel for the wife became aware that the April 11, 2006, notice was missing from the register's files and had never been docketed,[13] was docketed on July 25, 2006, eighty-nine days after the order on the motion to amend was docketed. At that point, the probate judge lacked the authority under Mass.R.A.P. 4(c) to enlarge the appeal period to encompass the July 25, 2006, notice of appeal. Rule 4(c) permits the lower court to "extend the time for filing the notice of appeal . . . for a period not to exceed thirty days from the expiration of the time otherwise prescribed by this rule." Mass. R.A.P. 4(c), as amended, 378 Mass. 928 (1979). Accordingly, the judge could not extend the time for filing a notice of appeal beyond June 27, 2006, sixty days after the order was docketed.

As we have noted, however, the plaintiff also sought leave

---

[11]We find it significant that under the versions of Mass.R.A.P. 4(a) prior to the cited amendment in 1985, the time for filing an appeal ran "from the making" of a specified postjudgment order, rather than "from the entry of the order." See 365 Mass. 846 (1974); 378 Mass. 928 (1979). See also *Abbott* v. *John Hancock Mut. Life Ins. Co.*, 18 Mass. App. Ct. 508, 510-512 & n.7 (1984).

[12]Much of the confusion in this case could have been avoided if the register had, as required by Mass.R.Dom.Rel.P. 77(d), "immediately upon the *entry* of an order . . . serve[d] a notice of the order . . . upon each party" (emphasis supplied).

[13]The attempt by the register's office to correct the procedural error, first by attempting to hold the April 11 notice and then by back-docketing the third notice of appeal, docketed on July 25, 2006, further complicated this procedurally difficult case. We note that any paper filed with the register's office is deemed to be filed on the date it is received; any dispute as to when a paper was filed must be resolved by a judge. See Mass.R.Dom.Rel.P. 77(c), which is identical to Mass.R.Civ.P. 77(c). See also Mass.R.Dom.Rel.P. 79(a), which is identical to Mass.R.Civ.P. 79(a) ("[a]ll papers filed with the clerk, all . . . orders, verdicts, and judgments shall be entered chronologically in the civil docket"). The register's obligation in this regard is purely ministerial. See *Gorod* v. *Tabachnick*, 428 Mass. 1001, 1001 (1998), and cases cited.

from a single justice of this court to file a late notice of appeal pursuant to Mass.R.A.P. 14(b), as amended, 378 Mass. 939 (1979), which, for good cause shown, permits an appellate court or a single justice thereof to enlarge the time for filing a notice of appeal for a period not to exceed one year from the date of entry of the judgment or order appealed from. See *Cummings* v. *City Council of Gloucester*, 28 Mass. App. Ct. 345, 348 (1990). Contrast *Blackburn* v. *Blackburn*, 22 Mass. App. Ct. 633, 635 (1986) (where court noted wife's failure to avail herself of "rescue apparatus" of Mass.R.A.P. 14[b]), quoting from *Points East, Inc.* v. *City Council of Gloucester*, 15 Mass. App. Ct. 722, 725 (1983). However, because the appeal from the probate court order dismissing the appeal was pending, the single justice lacked authority in the circumstances to extend the appeal period, as to do so would have required her in essence to "determine" the pending appeal in violation of the prohibition of Mass. R.A.P. 15(c), 365 Mass. 859 (1974) ("single justice may not dismiss or otherwise determine an appeal or other proceeding").[14] Accordingly, given the procedural posture presented to them, it cannot be said that either the order of the probate judge or the order of the single justice was in error.

Our inquiry, however, does not end there. The appellate court maintains independent authority under Mass.R.A.P. 14(b) to extend the appellate time period, and we are not constrained by the prohibition of Mass.R.A.P. 15(c). Accordingly, we have chosen to exercise our discretion to enlarge the time for filing the notice of appeal, nunc pro tunc, to July 25, 2006, rendering the third notice of appeal, docketed that day, timely. See *Commonwealth* v. *White*, 429 Mass. 258, 263-264 (1999) (one-year anniversary of order terminates right to file notice of appeal, but does not terminate jurisdiction of appellate court to allow motion to enlarge time, nunc pro tunc).

We do so having determined, in accordance with *Tisei* v. *Building Inspector of Marlborough*, 3 Mass. App. Ct. 377, 379

[14]Compare *Harvard Community Health Plan* v. *Assessors of Cambridge*, 384 Mass. 536, 537 n.2 (1981) (single justice had authority to enlarge time for filing notice of appeal under Mass.R.A.P. 14[b] in case where motion under Mass.R.A.P. 4[c] was previously denied by trial court and no appeal was taken from that denial).

(1975), that the wife's underlying appeal, which has been fully briefed and argued by both parties, has raised meritorious appellate issues. See part 3, *infra.* Moreover, she has established "good cause" for her failure to file a timely appeal in light of all the circumstances. There was confusion created by the register's failure to docket the judge's order and the second notice of appeal in a timely fashion and to send notice of the entries to the parties. There was also uncertainty regarding the application of the provision of rule 4(a) not previously construed. Allowing the appeal to proceed is consonant with our policy that errors by a court clerk "will generally be resolved in favor of preserving rights of appeal where this result is technically possible and does not work unfair prejudice to other parties." *Standard Register Co.* v. *Bolton-Emerson, Inc.,* 35 Mass. App. Ct. 570, 574 (1993), quoting from *Krupp* v. *Gulf Oil Corp.,* 29 Mass. App. Ct. 116, 121 (1990). The husband has not been prejudiced by the two-month delay in the filing of the notice of appeal, as the wife has diligently prosecuted her appeal in all other respects. Any prejudice he may have suffered as a result of the delay of the underlying appeal is mitigated by our determination to consider the merits of the underlying appeal now in light of the parties' thorough briefing of the substantive issues. See *Packard* v. *Packard,* 34 Mass. App. Ct. 543, 546 n.3 (1993).

3. *Validity of prenuptial agreement.* A prenuptial agreement is enforceable only if a judge determines the agreement to be valid. *DeMatteo* v. *DeMatteo,* 436 Mass. 18, 26 (2002) (*DeMatteo*). When determining the validity of an agreement, we look to the "fair disclosure" rules set out in *Rosenberg* v. *Lipnick,* 377 Mass. 666, 672 (1979), which require a judge to determine whether "(1) [the agreement] contains a fair and reasonable provision as measured at the time of its execution for the party contesting the agreement; (2) the contesting party was fully informed of the other party's worth prior to the agreement's execution, or had, or should have had, independent knowledge of the other party's worth; and (3) a *waiver by the contesting party* is set forth" (emphasis added). See *DeMatteo, supra.* The court must also consider the circumstances at the time of the divorce to ensure that the agreement does not leave the contesting spouse without necessary means of support. See *id.* at 37. See also

*Austin* v. *Austin*, 445 Mass. 601, 604 (2005). The rationale for imposing particular procedural and substantive requirements on the enforcement of prenuptial contracts has been explained by the American Law Institute as follows: "The distinctive expectations that persons planning to marry usually have about one another can disarm their capacity for self-protective judgment, or their inclination to exercise it, as compared to parties negotiating commercial agreements." American Law Institute, Principles of the Law of Family Dissolution: Analysis & Recommendations § 7.02 comment (c) (2002) (ALI Principles). Furthermore, "[f]amily contracts set aside otherwise applicable public policies while commercial agreements do not." *Ibid.* These differences between family and commercial contracts mean that in the former case "the law can reasonably require greater assurance that the parties understand and appreciate what they are doing . . . and may require rules that limit the enforcement of private agreements that significantly infringe upon [those public policies]." *Ibid.*

The wife's appeal focuses on the third fair disclosure requirement: she claims that the agreement is unenforceable because it lacks a meaningful informed waiver of marital rights. See *DeMatteo*, 436 Mass. at 26. A waiver is valid if the contesting party waives "all spousal rights, except those specifically provided in the agreement." *Id.* at 28. In *DeMatteo*, the wife signed an explicit waiver: "The parties acknowledged that they were informed of their rights, had considered the effect of the agreement on their estates, and freely and willingly waived rights that 'may well have great value' in exchange for the provisions of the agreement." *Id.* at 21 n.6.

The waiver was not considered just a formal requirement. The court emphasized that "[w]aiver is important because it underscores that each party is exercising a meaningful choice when he or she agrees to give up certain rights in anticipation of marriage." *Id.* at 29. The court went beyond the waiver language itself and stated that it was correct for the judge to consider such factors as "whether each party was represented by independent counsel, the adequacy of the time to review the agreement, the parties' understanding of the terms of the agreement and their effect, and a party's understanding of his or her rights in the absence of an agreement." *Ibid.*

In *DeMatteo*, the waiver was clear and comprehensive.[15] See *id.* at 21 n.6. In the present case, the agreement contained no waiver of the wife's rights. In *DeMatteo*, both parties were also represented by independent counsel. *Id.* at 20, 28. Here, neither side consulted a lawyer. The significance of the legal advice in *DeMatteo* was noted repeatedly by the court: counsel had written to the wife in part that "[w]hen you sign a pre-marital contract, you give up the opportunity of having the Court make an independent assignment of marital property, and accept the terms of the contract instead," *id.* at 29 n.21; counsel had also "enclosed a copy of G. L. c. 208, § 34, and instructed the wife to read it carefully, 'so that you can evaluate properly the terms of the Pre-Marital Agreement that we are negotiating.' " *Id.* at 29 n.23.[16] See *Austin* v. *Austin*, 445 Mass. at 606 (wife's attorney drafted agreement and the wife was fully aware of her rights).

Although the procedural and substantive safeguards imposed on prenuptial agreements render legal counsel highly advisable, we recognize that counsel cannot be required. Kindregan & Inker, Family Law & Practice § 20:6, at 751 (3d ed. 2002) ("there is no mandate that each party consult an attorney since a competent person can represent himself, however unwise such a choice may be"). Indeed the probate judge concluded that the

---

[15]Other examples of waivers appear in the treatises. See, e.g., Harvey, Moriarty, & Ryan, Massachusetts Domestic Relations 25-8 (4th ed. 2003) ("[wife] acknowledges that she is possessed of sufficient knowledge to make an informed decision to waive such rights and enters into this Agreement which establishes her rights in lieu of those under Massachusetts General Laws, Chapter 208, Section 34"); Kindregan & Inker, Family Law & Practice § 53:2, at 666 (3d ed. 2002) ("Except as otherwise specifically provided in this Agreement [the parties], in complete satisfaction of their rights to request an assignment of property under the law of any competent jurisdiction hereby waive rights to spousal support or property distribution and any other rights they may have to the property or income of the other except as provided for in this Agreement"); Zupcofska, Gould, Lee, & Schmidt, Before the "I Do's": Pre-Marital Agreements 51 (MCLE 2006) ("[t]he Parties have been informed by their respective counsel and hereby acknowledge that . . . in the event that the Parties should become divorced, in the absence of this Agreement or any other written agreement respecting their property rights, each Party may be entitled to an equitable distribution of the property of the other").

[16]The court also observed, however, that the wife "did not discuss" what she "might receive by way of property division from the Court in the event of a divorce." *DeMatteo*, 436 Mass. at 29.

wife had "ample opportunity to consult with an attorney but chose not to do so." There was, however, no evidence to suggest that the wife had been advised to obtain her own legal counsel. See ALI Principles § 7.04(3) ("A premarital agreement is rebuttably presumed to satisfy the [informed consent requirements] when the partying seeking to enforce the agreement shows that . . . [b] both parties were advised to obtain independent legal counsel, and had reasonable opportunity to do so").[17]

The other factors considered in *DeMatteo*, 436 Mass. at 29, also raise questions as to the validity of the waiver. The judge concluded that the parties had "sufficient time to review the document." When the agreement was drafted, however, is not clear from the factual findings. Also, the agreement was executed only five days before the marriage. Compare ALI Principles § 7.04(3) ("A premarital agreement is rebuttably presumed to satisfy the [the informed consent requirements] when the party seeking to enforce the agreement shows that [a] it was executed at least 30 days before the parties' marriage").

Also unclear is the parties' understanding of the terms of the agreement and their effect, and the parties' understanding of their rights in the absence of the agreement. See *DeMatteo*, 436 Mass. at 29. This was not "the case of [an] agreement[] concluded without the assistance of independent legal counsel for each party, [in which] the agreement states, in language easily understandable by an adult of ordinary intelligence with no legal training, . . . the nature of any rights or claims otherwise arising at dissolution that are altered by the contract, and the nature of that alteration." ALI Principles § 7.04(3)(c). Rather, the agreement contains no discussion of marital rights nor how such rights are altered. Furthermore, the provisions of the agreement are sketchy. Assets acquired after marriage other than gifts or inheritances are not clearly addressed or resolved by the one-page agreement, particularly when the document is read from a lay person's perspective.

---

[17]The ALI Principles sets out a somewhat different test for the enforcement of prenuptial agreements than *DeMatteo*, but considers many of the same factors. The commentary in the ALI Principles aids our analysis of the *DeMatteo* test.

The judge found, nonetheless, that the "circumstances demonstrate" the necessary understanding. We disagree. There is no evidence that the wife was informed of her marital rights as was the spouse in *DeMatteo.* See *DeMatteo,* 436 Mass. at 28-29. See also *Austin* v. *Austin,* 445 Mass. at 603 ("wife was fully advised of her rights when she executed the agreement and . . . having been divorced previously, was fully aware of her rights to alimony, support, property division, and child support"). The husband's very limited research provides no basis for concluding that either party understood their marital rights. Although the parties' high intelligence is a factor in favor of a finding of validity, see *Rosenberg* v. *Lipnick,* 377 Mass. at 672, it cannot alone compensate for an absence of legal knowledge. Although there may be highly intelligent biologists who understand the law, and highly intelligent lawyers who understand biology, neither understanding can be presumed absent some demonstration of it. Finally, it is not enough to know that marriage confers some undefined rights. A practical understanding of those rights is essential. Although a matrimonial lawyer's level of knowledge of marital rights is not required, what is necessary is a meaningful understanding that the agreement may provide for a disposition of property and support rights that could be very different from that to which the parties would otherwise be entitled under Massachusetts law should the case be presented to a judge to decide. See *DeMatteo,* 436 Mass. at 29, citing *Rinvelt* v. *Rinvelt,* 190 Mich. App. 372, 378 (1991) (each party must understand his or her rights and the extent of waiver of those rights); *Button* v. *Button,* 131 Wis. 2d 84, 96 (1986) (court to consider "whether the parties understood the terms of the agreement and their effect, and whether the parties understood their financial rights in the absence of an agreement"). See also *Austin* v. *Austin,* 445 Mass. at 606 (wife "fully aware" of her rights).

4. *Conclusion.* We exercise our powers, pursuant to Mass. R.A.P. 14(b); *Commonwealth* v. *White,* 429 Mass. 258, 262-265 (1999); and *Tisei* v. *Building Inspector of Marlborough,* 3 Mass. App. Ct. 377, 379 (1975), to deem the July 25, 2006, notice of appeal as timely nunc pro tunc. We therefore vacate the order of the Probate and Family Court dismissing the plaintiff's appeal

and the order of the single justice denying relief under Mass. R.A.P. 14(b). On the merits, as there is no express waiver of marital rights in the agreement, nor plain language or other evidence demonstrating that the parties sufficiently understood their marital rights and how they were altering them, and as the contesting party was not represented by legal counsel or even advised to seek such counsel, we conclude that the agreement does not contain a proper waiver of marital rights and is therefore invalid. The judgment, as amended, is reversed and the case is remanded to the Probate and Family Court for further proceedings consistent with this opinion.

*So ordered.*